(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FORD MOTOR CO. *v.* MONTANA EIGHTH JUDICIAL DISTRICT COURT ET AL.

### CERTIORARI TO THE SUPREME COURT OF MONTANA

No. 19–368. Argued October 7, 2020—Decided March 25, 2021*

Ford Motor Company is a global auto company, incorporated in Delaware and headquartered in Michigan. Ford markets, sells, and services its products across the United States and overseas. The company also encourages a resale market for its vehicles. In each of these two cases, a state court exercised jurisdiction over Ford in a products-liability suit stemming from a car accident that injured a resident in the State. The first suit alleged that a 1996 Ford Explorer had malfunctioned, killing Markkaya Gullett near her home in Montana. In the second suit, Adam Bandemer claimed that he was injured in a collision on a Minnesota road involving a defective 1994 Crown Victoria. Ford moved to dismiss both suits for lack of personal jurisdiction. It argued that each state court had jurisdiction only if the company's conduct in the State had given rise to the plaintiff's claims. And that causal link existed, according to Ford, only if the company had designed, manufactured, or sold in the State the particular vehicle involved in the accident. In neither suit could the plaintiff make that showing. The vehicles were designed and manufactured elsewhere, and the company had originally sold the cars at issue outside the forum States. Only later resales and relocations by consumers had brought the vehicles to Montana and Minnesota. Both States' supreme courts rejected Ford's argument. Each held that the company's activities in the State had the needed connection to the plaintiff's allegations that a defective Ford caused in-state injury.

*Held*: The connection between the plaintiffs' claims and Ford's activities

——————

*Together with No. 19–369, *Ford Motor Co.* v. *Bandemer*, on certiorari to the Supreme Court of Minnesota.

in the forum States is close enough to support specific jurisdiction. Pp. 4–18.

(a) The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant. The canonical decision in this area remains *International Shoe Co.* v. *Washington,* 326 U. S. 310. There, the Court held that a tribunal's authority depends on the defendant's having such "contacts" with the forum State that "the maintenance of the suit" is "reasonable" and "does not offend traditional notions of fair play and substantial justice." *Id.,* at 316–317. In applying that formulation, the Court has long focused on the nature and extent of "the defendant's relationship to the forum State." *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. ___, ___. That focus has led to the recognition of two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the State. *Goodyear Dunlop Tires Operations, S. A* v. *Brown*, 564 U. S 915, 919. Specific jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims. To be subject to that kind of jurisdiction, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson* v. *Denckla,* 357 U. S. 235, 253. And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum. *Bristol-Myers*, 582 U. S., at ___. Pp. 4−7.

(b) Ford admits that it has "purposefully avail[ed] itself of the privilege of conducting activities" in both States. *Hanson,* 357 U. S., at 253. The company's claim is instead that those activities are insufficiently connected to the suits. In Ford's view, due process requires a causal link locating jurisdiction only in the State where Ford sold the car in question, or the States where Ford designed and manufactured the vehicle. And because none of these things occurred in Montana or Minnesota, those States' courts have no power over these cases.

Ford's causation-only approach finds no support in this Court's requirement of a "connection" between a plaintiff's suit and a defendant's activities. *Bristol-Myers*, 582 U. S., at ___. The most common formulation of that rule demands that the suit "arise out of or relate to the defendant's contacts with the forum." *Id.*, at ___. The second half of that formulation, following the word "or," extends beyond causality. So the inquiry is not over if a causal test would put jurisdiction elsewhere. Another State's courts may yet have jurisdiction, because of a non-causal "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence involving the defendant that takes place within the State's borders." *Id.,* at ___−___.

And this Court has stated that specific jurisdiction attaches in cases

identical to this one—when a company cultivates a market for a product in the forum State and the product malfunctions there. See *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286. Here, Ford advertises and markets its vehicles in Montana and Minnesota, including the two models that allegedly malfunctioned in those States. Apart from sales, the company works hard to foster ongoing connections to its cars' owners. All this Montana- and Minnesota-based conduct relates to the claims in these cases, brought by state residents in the States' courts. Put slightly differently, because Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States, there is a strong "relationship among the defendant, the forum, and the litigation"—the "essential foundation" of specific jurisdiction. *Helicopteros Nacionales de Colombia, S. A.* v. *Hall,* 466 U. S. 408, 414. Allowing jurisdiction in these circumstances both treats Ford fairly and serves principles of "interstate federalism." *World-Wide Volkswagen,* 444 U. S., 293. Pp. 8–15.

(c) *Bristol-Myers* and *Walden* v. *Fiore,* 571 U. S. 277, reinforce all that the Court has said about why Montana's and Minnesota's courts may decide these cases. In *Bristol-Myers*, the Court found jurisdiction improper because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims. 582 U. S., at \_\_\_. That is not true of these cases, where the plaintiffs are residents of the forum States, used the allegedly defective products in the forum States, and suffered injuries when those products malfunctioned there. And *Walden* does not show, as Ford claims, that a plaintiff's residence and place of injury can never support jurisdiction. The defendant in *Walden* had never formed any contact with the forum State. Ford, by contrast, has a host of forum connections. The place of a plaintiff's injury and residence may be relevant in assessing the link between those connections and the plaintiff's suit. Pp. 15–18.

No. 19–368, 395 Mont. 478, 443 P. 3d 407, and No. 19–369, 931 N. W. 2d 744, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, and KAVANAUGH, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. BARRETT, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 19–368 and 19–369

————

FORD MOTOR COMPANY, PETITIONER
19–368            *v.*
MONTANA EIGHTH JUDICIAL DISTRICT
COURT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA

FORD MOTOR COMPANY, PETITIONER
19–369            *v.*
ADAM BANDEMER

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MINNESOTA

[March 25, 2021]

JUSTICE KAGAN delivered the opinion of the Court.

In each of these two cases, a state court held that it had jurisdiction over Ford Motor Company in a products-liability suit stemming from a car accident. The accident happened in the State where suit was brought. The victim was one of the State's residents. And Ford did substantial business in the State—among other things, advertising, selling, and servicing the model of vehicle the suit claims is defective. Still, Ford contends that jurisdiction is improper because the particular car involved in the crash was not first sold in the forum State, nor was it designed or manufactured there. We reject that argument. When a company

like Ford serves a market for a product in a State and that
product causes injury in the State to one of its residents,
the State's courts may entertain the resulting suit.

I

Ford is a global auto company. It is incorporated in Del-
aware and headquartered in Michigan. But its business is
everywhere. Ford markets, sells, and services its products
across the United States and overseas. In this country
alone, the company annually distributes over 2.5 million
new cars, trucks, and SUVs to over 3,200 licensed dealer-
ships. See App. 70, 100. Ford also encourages a resale mar-
ket for its products: Almost all its dealerships buy and sell
used Fords, as well as selling new ones. To enhance its
brand and increase its sales, Ford engages in wide-ranging
promotional activities, including television, print, online,
and direct-mail advertisements. No matter where you live,
you've seen them: "Have you driven a Ford lately?" or "Built
Ford Tough." Ford also ensures that consumers can keep
their vehicles running long past the date of sale. The com-
pany provides original parts to auto supply stores and re-
pair shops across the country. (Goes another slogan: "Keep
your Ford a Ford.") And Ford's own network of dealers offers
an array of maintenance and repair services, thus fostering
an ongoing relationship between Ford and its customers.

Accidents involving two of Ford's vehicles—a 1996 Ex-
plorer and a 1994 Crown Victoria—are at the heart of the
suits before us. One case comes from Montana. Markkaya
Gullett was driving her Explorer near her home in the State
when the tread separated from a rear tire. The vehicle spun
out, rolled into a ditch, and came to rest upside down. Gul-
lett died at the scene of the crash. The representative of her
estate sued Ford in Montana state court, bringing claims
for a design defect, failure to warn, and negligence. The
second case comes from Minnesota. Adam Bandemer was
a passenger in his friend's Crown Victoria, traveling on a

rural road in the State to a favorite ice-fishing spot. When his friend rear-ended a snowplow, this car too landed in a ditch. Bandemer's air bag failed to deploy, and he suffered serious brain damage. He sued Ford in Minnesota state court, asserting products-liability, negligence, and breach-of-warranty claims.

Ford moved to dismiss the two suits for lack of personal jurisdiction, on basically identical grounds. According to Ford, the state court (whether in Montana or Minnesota) had jurisdiction only if the company's conduct in the State had given rise to the plaintiff's claims. And that causal link existed, Ford continued, only if the company had designed, manufactured, or—most likely—sold in the State the par-ticular vehicle involved in the accident.[1] In neither suit could the plaintiff make that showing. Ford had designed the Explorer and Crown Victoria in Michigan, and it had manufactured the cars in (respectively) Kentucky and Can-ada. Still more, the company had originally sold the cars at issue outside the forum States—the Explorer in Washing-ton, the Crown Victoria in North Dakota. Only later resales and relocations by consumers had brought the vehicles to Montana and Minnesota. That meant, in Ford's view, that the courts of those States could not decide the suits.

Both the Montana and the Minnesota Supreme Courts (affirming lower court decisions) rejected Ford's argument. The Montana court began by detailing the varied ways Ford "purposefully" seeks to "serve the market in Montana." 395 Mont. 478, 488, 443 P. 3d 407, 414 (2019). The company advertises in the State; "has thirty-six dealerships" there; "sells automobiles, specifically Ford Explorers[,] and parts" to Montana residents; and provides them with "certified re-pair, replacement, and recall services." *Ibid.* Next, the

─────────
[1] Ford's Brief in Support of Motion to Dismiss in *Lucero* v. *Ford Motor Co.*, No. DV–18–247 (8th Jud. Dist., Cascade Cty., Mont.), pp. 14−15; Ford Motor Co.'s Memorandum in Support of Motion to Dismiss in No. 77–cv–16–1025 (7th Jud. Dist., Todd Cty., Minn.), pp. 11−12, and n. 3.

court assessed the relationship between those activities and the Gullett suit. Ford's conduct, said the court, encourages "Montana residents to drive Ford vehicles." *Id.,* at 491, 443 P. 3d, at 416. When that driving causes in-state injury, the ensuing claims have enough of a tie to Ford's Montana activities to support jurisdiction. Whether Ford "designed, manufactured, or sold [the] vehicle" in the State, the court concluded, is "immaterial." *Ibid.* Minnesota's Supreme Court agreed. It highlighted how Ford's "marketing and advertisements" influenced state residents to "purchase and drive more Ford vehicles." 931 N. W. 2d 744, 754 (2019). Indeed, Ford had sold in Minnesota "more than 2,000 1994 Crown Victoria[s]"—the "very type of car" involved in Bandemer's suit. *Id.,* at 751, 754. That the "*particular vehicle*" injuring him was "designed, manufactured, [and first] sold" elsewhere made no difference. *Id.,* at 753 (emphasis in original). In the court's view, Ford's Minnesota activities still had the needed connection to Bandemer's allegations that a defective Crown Victoria caused in-state injury. See *id.,* at 754.

We granted certiorari to consider if Ford is subject to jurisdiction in these cases. 589 U. S. ___ (2020). We hold that it is.

## II

### A

The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant. The canonical decision in this area remains *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945). There, the Court held that a tribunal's authority depends on the defendant's having such "contacts" with the forum State that "the maintenance of the suit" is "reasonable, in the context of our federal system of government," and "does not offend traditional notions of fair play and substantial justice." *Id.*, at 316–317 (internal quotation marks omitted). In giving content to that formulation, the Court has long focused

on the nature and extent of "the defendant's relationship to the forum State." *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 5) (citing cases). That focus led to our recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction. See *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 919 (2011).

A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the State. *Ibid.* General jurisdiction, as its name implies, extends to "any and all claims" brought against a defendant. *Ibid.* Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select "set of affiliations with a forum" will expose a defendant to such sweeping jurisdiction. *Daimler AG* v. *Bauman*, 571 U. S. 117, 137 (2014). In what we have called the "paradigm" case, an individual is subject to general jurisdiction in her place of domicile. *Ibid.* (internal quotation marks omitted). And the "equivalent" forums for a corporation are its place of incorporation and principal place of business. *Ibid.* (internal quotation marks omitted); see *id.*, at 139, n. 19 (leaving open "the possibility that in an exceptional case" a corporation might also be "at home" elsewhere). So general jurisdiction over Ford (as all parties agree) attaches in Delaware and Michigan—not in Montana and Minnesota. See *supra,* at 2.

Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name "purposeful availment." *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 475 (1985). The defendant, we have said, must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson* v. *Denckla*, 357

U. S. 235, 253 (1958). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 774 (1984). They must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden* v. *Fiore*, 571 U. S. 277, 285 (2014) (internal quotation marks and alterations omitted). Yet even then—because the defendant is not "at home"—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often stated, "must arise out of or relate to the defendant's contacts" with the forum. *Bristol-Myers*, 582 U. S., at ___ (slip op., at 5) (quoting *Daimler*, 571 U. S., at 127; alterations omitted); see, *e.g., Burger King*, 471 U. S., at 472; *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 414 (1984); *International Shoe*, 326 U. S., at 319. Or put just a bit differently, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers*, 582 U. S., at ___–___, ___ (slip op., at 5−6, 7) (quoting *Goodyear*, 564 U. S., at 919).

These rules derive from and reflect two sets of values—treating defendants fairly and protecting "interstate federalism." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 293 (1980); see *id.,* at 297–298. Our decision in *International Shoe* founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company "exercises the privilege of conducting activities within a state"—thus "enjoy[ing] the benefits and protection of [its] laws"—the State may hold the company to account for related misconduct. 326 U. S., at 319; see *Burger King*, 471 U. S., at 475−476. Later decisions have added that our doctrine similarly provides defendants with "fair warning"—knowledge that "a particular activity may

subject [it] to the jurisdiction of a foreign sovereign." *Id.,* at 472 (internal quotation marks omitted); *World-Wide Volkswagen*, 444 U. S., at 297 (likewise referring to "clear notice"). A defendant can thus "structure [its] primary conduct" to lessen or avoid exposure to a given State's courts. *Id.*, at 297. And this Court has considered alongside defendants' interests those of the States in relation to each other. One State's "sovereign power to try" a suit, we have recognized, may prevent "sister States" from exercising their like authority. *Id.,* at 293. The law of specific jurisdiction thus seeks to ensure that States with "little legitimate interest" in a suit do not encroach on States more affected by the controversy. *Bristol-Myers*, 582 U. S., at ___ (slip op., at 6).[2]

## B

Ford contends that our jurisdictional rules prevent Montana's and Minnesota's courts from deciding these two suits. In making that argument, Ford does not contest that it does substantial business in Montana and Minnesota— that it actively seeks to serve the market for automobiles

––––––––––

[2] One of the concurrences here expresses a worry that our *International Shoe*-based body of law is not "well suited for the way in which business is now conducted," and tentatively suggests a 21st-century rethinking. *Post,* at 1 (ALITO, J., concurring in judgment). Fair enough perhaps, see *infra,* at 12−13, n. 4, but the concurrence then acknowledges that these cases have no distinctively modern features, and it decides them on grounds that (as it agrees) are much the same as ours. See *post*, at 3−4; compare *ibid.* with *infra*, at 11–15. The other concurrence proposes instead a return to the mid-19th century—a replacement of our current doctrine with the Fourteenth Amendment's original meaning respecting personal jurisdiction. *Post,* at 9−10 (GORSUCH, J., concurring in judgment). But that opinion never reveals just what the Due Process Clause as understood at its ratification required, and its ground for deciding these cases is correspondingly spare. *Post,* at 11. This opinion, by contrast, resolves these cases by proceeding as the Court has done for the last 75 years—applying the standards set out in *International Shoe* and its progeny, with attention to their underlying values of ensuring fairness and protecting interstate federalism.

and related products in those States.  See Brief for Peti-
tioner 6, 9, 13.  Or to put that concession in more doctrinal
terms, Ford agrees that it has "purposefully avail[ed] itself
of the privilege of conducting activities" in both places.
*Hanson*, 357 U. S., at 253; see *supra,* at 5–6.  Ford's claim
is instead that those activities do not sufficiently connect to
the suits, even though the resident-plaintiffs allege that
Ford cars malfunctioned in the forum States.  In Ford's
view, the needed link must be causal in nature: Jurisdiction
attaches "only if the defendant's forum conduct *gave rise* to
the plaintiff's claims."  Brief for Petitioner 13 (emphasis in
original).  And that rule reduces, Ford thinks, to locating
specific jurisdiction in the State where Ford sold the car in
question, or else the States where Ford designed and man-
ufactured the vehicle.  See *id.,* at 2; Reply Brief 2, 19; *supra,*
at 3 (identifying those States).  On that view, the place of
accident and injury is immaterial.  So (Ford says) Mon-
tana's and Minnesota's courts have no power over these
cases.

But Ford's causation-only approach finds no support in
this Court's requirement of a "connection" between a plain-
tiff's suit and a defendant's activities.  *Bristol-Myers*, 582
U. S., at ___ (slip op., at 8).  That rule indeed serves to nar-
row the class of claims over which a state court may exer-
cise specific jurisdiction.  But not quite so far as Ford wants.
None of our precedents has suggested that only a strict
causal relationship between the defendant's in-state activ-
ity and the litigation will do.  As just noted, our most com-
mon formulation of the rule demands that the suit "arise
out of *or relate to* the defendant's contacts with the forum."
*Id.*, at ___ (slip op., at 5) (quoting *Daimler*, 571 U. S., at 127;
emphasis added; alterations omitted); see *supra,* at 6.  The
first half of that standard asks about causation; but the
back half, after the "or," contemplates that some relation-
ships will support jurisdiction without a causal showing.
That does not mean anything goes.  In the sphere of specific

jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.,* proof that the plaintiff's claim came about because of the defendant's in-state conduct. See also *Bristol-Myers*, 582 U. S., at \_\_\_, \_\_\_ (slip op., at 5, 7) (quoting *Goodyear*, 564 U. S., at 919) (asking whether there is "an affiliation between the forum and the underlying controversy," without demanding that the inquiry focus on cause). So the case is not over even if, as Ford argues, a causal test would put jurisdiction in only the States of first sale, manufacture, and design. A different State's courts may yet have jurisdiction, because of another "activity [or] occurrence" involving the defendant that takes place in the State. *Bristol-Myers*, 582 U. S., at \_\_\_, \_\_\_ (slip op., at 6, 7) (quoting *Goodyear*, 564 U. S., at 919).[3]

And indeed, this Court has stated that specific jurisdiction attaches in cases identical to the ones here—when a company like Ford serves a market for a product in the forum State and the product malfunctions there. In *World-Wide Volkswagen*, the Court held that an Oklahoma court could not assert jurisdiction over a New York car dealer just because a car it sold later caught fire in Oklahoma. 444 U. S., at 295. But in so doing, we contrasted the dealer's position to that of two other defendants—Audi, the car's

—————

[3] In thus reiterating this Court's longstanding approach, we reject JUSTICE GORSUCH's apparent (if oblique) view that a state court should have jurisdiction over a nationwide corporation like Ford on *any* claim, no matter how unrelated to the State or Ford's activities there. See *post,* at 11. On that view, for example, a California court could hear a claim against Ford brought by an Ohio plaintiff based on an accident occurring in Ohio involving a car purchased in Ohio. Removing the need for any connection between the case and forum State would transfigure our specific jurisdiction standard as applied to corporations. "Case-linked" jurisdiction, see *supra,* at 5–6, would then become not case-linked at all.

manufacturer, and Volkswagen, the car's nationwide im-
porter (neither of which contested jurisdiction):

> "[I]f the sale of a product of a manufacturer or distrib-
> utor such as Audi or Volkswagen is not simply an iso-
> lated occurrence, but arises from the efforts of the man-
> ufacturer or distributor to serve, directly or indirectly,
> the market for its product in [several or all] other
> States, it is not unreasonable to subject it to suit in one
> of those States if its allegedly defective merchandise
> has there been the source of injury to its owner or to
> others." *Id.*, at 297.

Or said another way, if Audi and Volkswagen's business de-
liberately extended into Oklahoma (among other States),
then Oklahoma's courts could hold the companies account-
able for a car's catching fire there—even though the vehicle
had been designed and made overseas and sold in New
York. For, the Court explained, a company thus "purpose-
fully avail[ing] itself" of the Oklahoma auto market "has
clear notice" of its exposure in that State to suits arising
from local accidents involving its cars. *Ibid.* And the com-
pany could do something about that exposure: It could "act
to alleviate the risk of burdensome litigation by procuring
insurance, passing the expected costs on to customers, or, if
the risks are [still] too great, severing its connection with
the State." *Ibid.*

Our conclusion in *World-Wide Volkswagen*—though, as
Ford notes, technically "dicta," Brief for Petitioner 34—has
appeared and reappeared in many cases since. So, for ex-
ample, the Court in *Keeton* invoked that part of *World-Wide
Volkswagen* to show that when a corporation has "continu-
ously and deliberately exploited [a State's] market, it must
reasonably anticipate being haled into [that State's]
court[s]" to defend actions "based on" products causing in-
jury there. 465 U. S., at 781 (citing 444 U. S., at 297–298);
see *Burger King*, 471 U. S., at 472–473 (similarly citing

*World-Wide Volkswagen*). On two other occasions, we reaffirmed that rule by reciting the above block-quoted language verbatim. See *Goodyear*, 564 U. S., at 927; *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 110 (1987) (opinion of O'Connor, J.). And in *Daimler*, we used the Audi/Volkswagen scenario as a paradigm case of specific jurisdiction (though now naming Daimler, the maker of Mercedes Benzes). Said the Court, to "illustrate[ ]" specific jurisdiction's "province[ ]": A California court would exercise specific jurisdiction "if a California plaintiff, injured in a California accident involving a Daimler-manufactured vehicle, sued Daimler [in that court] alleging that the vehicle was defectively designed." 571 U. S., at 127, n. 5. As in *World-Wide Volkswagen*, the Court did not limit jurisdiction to where the car was designed, manufactured, or first sold. Substitute Ford for Daimler, Montana and Minnesota for California, and the Court's "illustrat[ive]" case becomes . . . the two cases before us.

To see why Ford is subject to jurisdiction in these cases (as Audi, Volkswagen, and Daimler were in their analogues), consider first the business that the company regularly conducts in Montana and Minnesota. See generally 395 Mont., at 488, 443 P. 3d, at 414; 931 N. W. 2d, at 748; *supra,* at 3–4. Small wonder that Ford has here conceded "purposeful availment" of the two States' markets. See *supra,* at 7–8. By every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail— Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias. Ford cars—again including those two models—are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota. And apart from sales, Ford works hard to foster ongoing connections to its cars' owners. The company's dealers in Montana and Minnesota (as elsewhere) regularly maintain and repair Ford cars, including those whose warranties

have long since expired. And the company distributes replacement parts both to its own dealers and to independent auto shops in the two States. Those activities, too, make Ford money. And by making it easier to own a Ford, they encourage Montanans and Minnesotans to become lifelong Ford drivers.

Now turn to how all this Montana- and Minnesota-based conduct relates to the claims in these cases, brought by state residents in Montana's and Minnesota's courts. Each plaintiff's suit, of course, arises from a car accident in one of those States. In each complaint, the resident-plaintiff alleges that a defective Ford vehicle—an Explorer in one, a Crown Victoria in the other—caused the crash and resulting harm. And as just described, Ford had advertised, sold, and serviced those two car models in both States for many years. (Contrast a case, which we do not address, in which Ford marketed the models in only a different State or region.) In other words, Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States. So there is a strong "relationship among the defendant, the forum, and the litigation"—the "essential foundation" of specific jurisdiction. *Helicopteros*, 466 U. S., at 414 (internal quotation marks omitted). That is why this Court has used this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident) as an illustration—even a paradigm example—of how specific jurisdiction works. See *Daimler*, 571 U. S., at 127, n. 5; *supra,* at 11.[4]

--------

[4] None of this is to say that any person using any means to sell any good in a State is subject to jurisdiction there if the product malfunctions after arrival. We have long treated isolated or sporadic transactions differently from continuous ones. See, *e.g., World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 297 (1980); *supra,* at 6. And we do not here consider internet transactions, which may raise doctrinal questions of their own. See *Walden* v. *Fiore*, 571 U. S. 277, 290, n. 9 (2014) ("[T]his

The only complication here, pressed by Ford, is that the company sold the specific cars involved in these crashes outside the forum States, with consumers later selling them to the States' residents. Because that is so, Ford argues, the plaintiffs' claims "would be precisely the same if Ford had never done anything in Montana and Minnesota." Brief for Petitioner 46. Of course, that argument merely restates Ford's demand for an exclusively causal test of connection— which we have already shown is inconsistent with our caselaw. See Tr. of Oral Arg. 4; *supra*, at 8−9. And indeed, a similar assertion could have been made in *World-Wide Volkswagen*—yet the Court made clear that systematic contacts in Oklahoma rendered Audi accountable there for an in-state accident, even though it involved a car sold in New York. See *supra,* at 9−10. So too here, and for the same reasons, see *supra,* at 11−12—even supposing (as Ford does) that without the company's Montana or Minnesota contacts the plaintiffs' claims would be just the same.

But in any event, that assumption is far from clear. For the owners of these cars might never have bought them, and so these suits might never have arisen, except for Ford's contacts with their home States. Those contacts might turn any resident of Montana or Minnesota into a Ford owner—even when he buys his car from out of state. He may make that purchase because he saw ads for the car in local media. And he may take into account a raft of Ford's in-state activities designed to make driving a Ford

—————————

case does not present the very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State"). So consider, for example, a hypothetical offered at oral argument. "[A] retired guy in a small town" in Maine "carves decoys" and uses "a site on the Internet" to sell them. Tr. of Oral Arg. 39. "Can he be sued in any state if some harm arises from the decoy?" *Ibid*. The differences between that case and the ones before us virtually list themselves. (Just consider all our descriptions of Ford's activities outside its home bases.) So we agree with the plaintiffs' counsel that resolving these cases does not also resolve the hypothetical. See *id.,* at 39−40.

convenient there: that Ford dealers stand ready to service
the car; that other auto shops have ample supplies of Ford
parts; and that Ford fosters an active resale market for its
old models.  The plaintiffs here did not in fact establish, or
even allege, such causal links.  But cf. *post,* at 3–4 (ALITO,
J., concurring in judgment) (nonetheless finding some kind
of causation).  Nor should jurisdiction in cases like these
ride on the exact reasons for an individual plaintiff's pur-
chase, or on his ability to present persuasive evidence about
them.[5]  But the possibilities listed above—created by the
reach of Ford's Montana and Minnesota contacts—under-
score the aptness of finding jurisdiction here, even though
the cars at issue were first sold out of state.

For related reasons, allowing jurisdiction in these cases
treats Ford fairly, as this Court's precedents explain.  In
conducting so much business in Montana and Minnesota,
Ford "enjoys the benefits and protection of [their] laws"—
the enforcement of contracts, the defense of property, the
resulting formation of effective markets.  *International
Shoe*, 326 U. S., at 319.  All that assistance to Ford's in-
state business creates reciprocal obligations—most rele-
vant here, that the car models Ford so extensively markets
in Montana and Minnesota be safe for their citizens to use
there.  Thus our repeated conclusion: A state court's en-
forcement of that commitment, enmeshed as it is with
Ford's government-protected in-state business, can "hardly
be said to be undue."  *Ibid.*; see *supra,* at 10−11.  And as
*World-Wide Volkswagen* described, it cannot be thought
surprising either.  An automaker regularly marketing a ve-
hicle in a State, the Court said, has "clear notice" that it will
be subject to jurisdiction in the State's courts when the
product malfunctions there (regardless where it was first

––––––––––
[5] It should, for example, make no difference if a plaintiff had recently
moved to the forum State with his car, and had not made his purchasing
decision with that move in mind—so had not considered any of Ford's
activities in his new home State.

sold). 444 U. S., at 297; see *supra,* at 10. Precisely because that exercise of jurisdiction is so reasonable, it is also predictable—and thus allows Ford to "structure [its] primary conduct" to lessen or even avoid the costs of state-court litigation. *World-Wide Volkswagen*, 444 U. S., at 297.

Finally, principles of "interstate federalism" support jurisdiction over these suits in Montana and Minnesota. *Id.*, at 293. Those States have significant interests at stake— "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors," as well as enforcing their own safety regulations. *Burger King*, 471 U. S., at 473; see *Keeton*, 465 U. S., at 776. Consider, next to those, the interests of the States of first sale (Washington and North Dakota)—which Ford's proposed rule would make the most likely forums. For each of those States, the suit involves all out-of-state parties, an out-of-state accident, and out-of-state injuries; the suit's only connection with the State is that a former owner once (many years earlier) bought the car there. In other words, there is a less significant "relationship among the defendant, the forum, and the litigation." *Walden*, 571 U. S., at 284 (internal quotation marks omitted). So by channeling these suits to Washington and North Dakota, Ford's regime would undermine, rather than promote, what the company calls the Due Process Clause's "jurisdiction-allocating function." Brief for Petitioner 24.

C

Ford mainly relies for its rule on two of our recent decisions—*Bristol-Myers* and *Walden*. But those precedents stand for nothing like the principle Ford derives from them. If anything, they reinforce all we have said about why Montana's and Minnesota's courts can decide these cases.

Ford says of *Bristol-Myers* that it "squarely foreclose[s]" jurisdiction. Reply Brief 2. In that case, non-resident plaintiffs brought claims in California state court against

Bristol-Myers Squibb, the manufacturer of a nationally marketed prescription drug called Plavix. The plaintiffs had not bought Plavix in California; neither had they used or suffered any harm from the drug there. Still, the California Supreme Court thought it could exercise jurisdiction because Bristol-Myers Squibb sold Plavix in California and was defending there against identical claims brought by the State's residents. This Court disagreed, holding that the exercise of jurisdiction violated the Fourteenth Amendment. In Ford's view, the same must be true here. Each of these plaintiffs, like the plaintiffs in *Bristol-Myers*, alleged injury from a particular item (a car, a pill) that the defendant had sold outside the forum State. Ford reads *Bristol-Myers* to preclude jurisdiction when that is true, even if the defendant regularly sold "the same *kind* of product" in the State. Reply Brief 2 (emphasis in original).

But that reading misses the point of our decision. We found jurisdiction improper in *Bristol-Myers* because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims. See 582 U. S., at ___ (slip op., at 8) ("What is needed—and what is missing here—is a connection between the forum and the specific claims at issue"). The plaintiffs, the Court explained, were not residents of California. They had not been prescribed Plavix in California. They had not ingested Plavix in California. And they had not sustained their injuries in California. See *ibid.* (emphasizing these points). In short, the plaintiffs were engaged in forum-shopping—suing in California because it was thought plaintiff-friendly, even though their cases had no tie to the State. See *id.,* at ___ (slip op., at 10) (distinguishing the Plavix claims from the litigation in *Keeton*, see *supra,* at 10, because they "involv[e] no in-state injury and no injury to residents of the forum State"). That is not at all true of the cases before us. Yes, Ford sold the specific products in other States, as Bristol-Myers Squibb had. But here, the plaintiffs are residents of

the forum States. They used the allegedly defective products in the forum States. And they suffered injuries when those products malfunctioned in the forum States. In sum, each of the plaintiffs brought suit in the most natural State—based on an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place" there. *Bristol-Myers*, 582 U. S., at ___–___, ___ (slip op., at 5−6, 7) (internal quotation marks omitted). So *Bristol-Myers* does not bar jurisdiction.

Ford falls back on *Walden* as its last resort. In that case, a Georgia police officer working at an Atlanta airport searched, and seized money from, two Nevada residents before they embarked on a flight to Las Vegas. The victims of the search sued the officer in Nevada, arguing that their alleged injury (their inability to use the seized money) occurred in the State in which they lived. This Court held the exercise of jurisdiction in Nevada improper even though "the plaintiff[s] experienced [the] effect[s]" of the officer's conduct there. 571 U. S., at 290. According to Ford, our ruling shows that a plaintiff's residence and place of injury can never support jurisdiction. See Brief for Petitioner 32. And without those facts, Ford concludes, the basis for jurisdiction crumbles here as well.

But *Walden* has precious little to do with the cases before us. In *Walden*, only the plaintiffs had any contacts with the State of Nevada; the defendant-officer had never taken any act to "form[ ] a contact" of his own. 571 U. S., at 290. The officer had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.*, at 289. So to use the language of our doctrinal test: He had not "purposefully avail[ed himself] of the privilege of conducting activities" in the forum State. *Hanson*, 357 U. S., at 253. Because that was true, the Court had no occasion to address the necessary connection between a defendant's in-state activity and the plaintiff's claims. But

here, Ford has a veritable truckload of contacts with Montana and Minnesota, as it admits. See *supra,* at 11−12. The only issue is whether those contacts are related enough to the plaintiffs' suits. As to that issue, so what if (as *Walden* held) the place of a plaintiff's injury and residence cannot create a defendant's contact with the forum State? Those places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit—including its assertions of who was injured where. And indeed, that relevance is a key part of *Bristol-Myers*' reasoning. See 582 U. S., at ___ (slip op., at 9) (finding a lack of "connection" in part because the "plaintiffs are not California residents and do not claim to have suffered harm in that State"). One of Ford's own favorite cases thus refutes its appeal to the other.

\* \* \*

Here, resident-plaintiffs allege that they suffered in-state injury because of defective products that Ford extensively promoted, sold, and serviced in Montana and Minnesota. For all the reasons we have given, the connection between the plaintiffs' claims and Ford's activities in those States— or otherwise said, the "relationship among the defendant, the forum[s], and the litigation"—is close enough to support specific jurisdiction. *Walden*, 571 U. S., at 284 (internal quotation marks omitted). The judgments of the Montana and Minnesota Supreme Courts are therefore affirmed.

*It is so ordered.*

JUSTICE BARRETT took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 19–368 and 19–369

---

FORD MOTOR COMPANY, PETITIONER
19–368                    *v.*
MONTANA EIGHTH JUDICIAL DISTRICT
COURT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA

FORD MOTOR COMPANY, PETITIONER
19–369                    *v.*
ADAM BANDEMER

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MINNESOTA

[March 25, 2021]

JUSTICE ALITO, concurring in the judgment.

These cases can and should be decided without any alteration or refinement of our case law on specific personal jurisdiction. To be sure, for the reasons outlined in JUSTICE GORSUCH's thoughtful opinion, there are grounds for questioning the standard that the Court adopted in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945). And there are also reasons to wonder whether the case law we have developed since that time is well suited for the way in which business is now conducted. But there is nothing distinctively 21st century about the question in the cases now before us, and the answer to that question is settled by our case law.

Since *International Shoe,* the rule has been that a state court can exercise personal jurisdiction over a defendant if the defendant has "minimum contacts" with the forum—

which means that the contacts must be "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.,* at 316 (quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940)).

That standard is easily met here. Ford has long had a heavy presence in Minnesota and Montana. It spends billions on national advertising. It has many franchises in both States. Ford dealers in Minnesota and Montana sell and service Ford vehicles, and Ford ships replacement parts to both States. In entertaining these suits, Minnesota and Montana courts have not reached out and grabbed suits in which they "have little legitimate interest." *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. ___, ___ (2017) (slip op., at 6). *Their* residents, while riding in vehicles purchased within *their* borders, were killed or injured in accidents on *their* roads. Can anyone seriously argue that requiring Ford to litigate these cases in Minnesota and Montana would be fundamentally unfair?

Well, Ford makes that argument. It would send the plaintiffs packing to the jurisdictions where the vehicles in question were assembled (Kentucky and Canada), designed (Michigan), or first sold (Washington and North Dakota) or where Ford is incorporated (Delaware) or has its principal place of business (Michigan).

As might have been predicted, the Court unanimously rejects this understanding of "traditional notions of fair play and substantial justice." And in doing so, we merely follow what we said in *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 297–298 (1980), which was essentially this: If a car manufacturer makes substantial efforts to sell vehicles in States A and B (and other States), and a defect in a vehicle first sold in State A causes injuries in an accident in State B, the manufacturer can be sued in State B. That rule decides these cases.

Ford, however, asks us to adopt an unprecedented rule

under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff's injury. The Court properly rejects that argument, and I agree with the main thrust of the Court's opinion. My only quibble is with the new gloss that the Court puts on our case law. Several of our opinions have said that a plaintiff's claims "'must arise out of or relate to the defendant's contacts'" with the forum. See *ante*, at 6 (citing cases). The Court parses this phrase "as though we were dealing with language of a statute," *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979), and because this phrase is cast in the disjunctive, the Court recognizes a new category of cases in which personal jurisdiction is permitted: those in which the claims do not "arise out of" (*i.e.*, are not caused by) the defendant's contacts but nevertheless sufficiently "relate to" those contacts in some undefined way, *ante*, at 8–9.

This innovation is unnecessary and, in my view, unwise. To say that the Constitution does not require the kind of proof of causation that Ford would demand—what the majority describes as a "strict causal relationship," *ante,* at 8— is not to say that no causal link of any kind is needed. And here, there is a sufficient link. It is reasonable to infer that the vehicles in question here would never have been on the roads in Minnesota and Montana if they were some totally unknown brand that had never been advertised in those States, was not sold in those States, would not be familiar to mechanics in those States, and could not have been easily repaired with parts available in those States. See *ante,* at 13–14 (describing this relationship between Ford's activities and these suits). The whole point of those activities was to put more Fords (including those in question here) on Minnesota and Montana roads. The common-sense relationship between Ford's activities and these suits, in other words, is causal in a broad sense of the concept, and personal jurisdiction can rest on this type of link without strict

proof of the type Ford would require.  When "arise out of"
is understood in this way, it is apparent that "arise out of"
and "relate to" overlap and are not really two discrete
grounds for jurisdiction.  The phrase "arise out of or
relate to" is simply a way of restating the basic "minimum
contacts" standard adopted in *International Shoe.*

Recognizing "relate to" as an independent basis for
specific jurisdiction risks needless complications.  The "or-
dinary meaning" of the phrase "relate to" "is a broad one."
*Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 383
(1992).  Applying that phrase "according to its terms [is] a
project doomed to failure, since, as many a curbstone phi-
losopher has observed, everything is related to everything
else." *California Div. of Labor Standards Enforcement* v.
*Dillingham Constr., N. A., Inc.,* 519 U. S. 316, 335 (1997)
(Scalia, J., concurring).  To rein in this phrase, limits must
be found, and the Court assures us that "relate to," as it now
uses the concept, "incorporates real limits." *Ante,* at 9.  But
without any indication what those limits might be, I doubt
that the lower courts will find that observation terribly
helpful.  Instead, what limits the potentially boundless
reach of "relate to" is just the sort of rough causal connec-
tion I have described.

I would leave the law exactly where it stood before we
took these cases, and for that reason, I concur in the
judgment.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 19–368 and 19–369

———————

FORD MOTOR COMPANY, PETITIONER
19–368              *v.*
MONTANA EIGHTH JUDICIAL DISTRICT
COURT, ET AL.

*ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA*

FORD MOTOR COMPANY, PETITIONER
19–369              *v.*
ADAM BANDEMER

*ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MINNESOTA*

[March 25, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in the judgment.

Since *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), this Court's cases have sought to divide the world of personal jurisdiction in two. A tribunal with "general jurisdiction" may entertain any claim against the defendant. But to trigger this power, a court usually must ensure the defendant is "'at home'" in the forum State. *Daimler AG* v. *Bauman*, 571 U. S. 117, 137 (2014). Meanwhile, "specific jurisdiction" affords a narrower authority. It applies only when the defendant "'purposefully avails'" itself of the opportunity to do business in the forum State and the suit "'arise[s] out of or relate[s] to'" the defendant's contacts with the forum State. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 472, 475 (1985).

While our cases have long admonished lower courts to

keep these concepts distinct, some of the old guardrails have begun to look a little battered. Take general jurisdiction. If it made sense to speak of a corporation having one or two "homes" in 1945, it seems almost quaint in 2021 when corporations with global reach often have massive operations spread across multiple States. To cope with these changing economic realities, this Court has begun cautiously expanding the old rule in "'exceptional case[s].'" *BNSF R. Co.* v. *Tyrrell*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 10).

Today's case tests the old boundaries from another direction. Until now, many lower courts have proceeded on the premise that specific jurisdiction requires two things. First, the defendant must "purposefully avail" itself of the chance to do business in a State. Second, the plaintiff's suit must "arise out of or relate to" the defendant's in-state activities. Typically, courts have read this second phrase as a unit requiring at least a but-for causal link between the defendant's local activities and the plaintiff's injuries. *E.g., Tamburo* v. *Dworkin*, 601 F. 3d 693, 708–709 (CA7 2010) (collecting cases); see also *Burger King*, 471 U. S., at 475 (discussing "proximate[] results"). As every first year law student learns, a but-for causation test isn't the most demanding. At a high level of abstraction, one might say any event in the world would not have happened "but for" events far and long removed.

Now, though, the Court pivots away from this understanding. Focusing on the phrase "arise out of or relate to" that so often appears in our cases, the majority asks us to parse those words "as though we were dealing with language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979). In particular, the majority zeros in on the disjunctive conjunction "or," and proceeds to build its entire opinion around that linguistic feature. *Ante*, at 8–9. The majority admits that "arise out of" may connote causation. But, it argues, "relate to" is an independent clause that does

not.

Where this leaves us is far from clear. For a case to "relate to" the defendant's forum contacts, the majority says, it is enough if an "affiliation" or "relationship" or "connection" exists between them. *Ante,* at 6, 12, 16. But what does this assortment of nouns *mean*? Loosed from any causation standard, we are left to guess. The majority promises that its new test "does not mean anything goes," but that hardly tells us what does. *Ante,* at 9. In some cases, the new test may prove more forgiving than the old causation rule. But it's hard not to wonder whether it may also sometimes turn out to be more demanding. Unclear too is whether, in cases like that, the majority would treat causation and "affiliation" as alternative routes to specific jurisdiction, or whether it would deny jurisdiction outright.

For a glimpse at the complications invited by today's decision, consider its treatment of North Dakota and Washington. Those are the States where Ford first sold the allegedly defective cars at issue in the cases before us. The majority seems to suggest that, if the plaintiffs had sought to bring their suits in those States, they would have failed. The majority stresses that the "only connection" between the plaintiffs' claims and North Dakota and Washington is the fact that former owners once bought the allegedly defective cars there. *Ante,* at 15. But the majority never tells us why that "connection" isn't enough. Surely, North Dakota and Washington would contend they have a strong interest in ensuring they don't become marketplaces for unreasonably dangerous products. Nor is it clear why the majority casts doubt on the availability of specific jurisdiction in these States without bothering to consider whether the old causation test might allow it. After all, no one doubts Ford purposefully availed itself of those markets. The plaintiffs' injuries, at least arguably, "arose from" (or were caused by) the sale of defective cars in those places. Even if the majority's new affiliation test isn't satisfied,

don't we still need to ask those causation questions, or are they now to be abandoned?

Consider, too, a hypothetical the majority offers in a footnote. The majority imagines a retiree in Maine who starts a one-man business, carving and selling wooden duck decoys. In time, the man sells a defective decoy over the Internet to a purchaser in another State who is injured. See *ante*, at 13, n. 4. We aren't told how. (Was the decoy coated in lead paint?) But put that aside. The majority says this hypothetical supplies a useful study in contrast with our cases. On the majority's telling, Ford's "continuous" contacts with Montana and Minnesota are enough to establish an "affiliation" with those States; by comparison, the decoy seller's contacts may be too "isolated" and "sporadic" to entitle an injured buyer to sue in his home State. But if this comparison highlights anything, it is only the litigation sure to follow. For between the poles of "continuous" and "isolated" contacts lie a virtually infinite number of "affiliations" waiting to be explored. And when it comes to that vast terrain, the majority supplies no meaningful guidance about what kind or how much of an "affiliation" will suffice. Nor, once more, does the majority tell us whether its new affiliation test supplants or merely supplements the old causation inquiry.

Not only does the majority's new test risk adding new layers of confusion to our personal jurisdiction jurisprudence. The whole project seems unnecessary. Immediately after disavowing any need for a causal link between the defendant's forum activities and the plaintiffs' injuries, the majority proceeds to admit that such a link may be present here. *Ante,* at 14. The majority stresses that the Montana and Minnesota plaintiffs before us "might" have purchased their cars because of Ford's activities in their home States. They "may" have relied on Ford's local advertising. And they "may" have depended on Ford's promise to furnish in-state servicers and dealers. If the majority is right about these

things, that would be more than enough to establish a but-for causal link between Ford's in-state activities and the plaintiffs' decisions to purchase their allegedly defective vehicles. Nor should that result come as a surprise: One might expect such causal links to be easy to prove in suits against corporate behemoths like Ford. All the new euphemisms—"affiliation," "relationship," "connection"—thus seem pretty pointless.[1]

*

With the old *International Shoe* dichotomy looking increasingly uncertain, it's hard not to ask how we got here and where we might be headed.

Before *International Shoe*, it seems due process was usually understood to guarantee that only a court of competent jurisdiction could deprive a defendant of his life, liberty, or property. In turn, a court's competency normally depended on the defendant's presence in, or consent to, the sovereign's jurisdiction. But once a plaintiff was able to "tag" the defendant with process in the jurisdiction, that State's courts were generally thought competent to render judgment on any claim against the defendant, whether it involved events inside or outside the State. *Pennoyer* v. *Neff*, 95 U. S. 714, 733 (1878); *Burnham* v. *Superior Court of Cal.*,

_____

[1] The majority says personal jurisdiction should not turn on a plaintiff's ability to "allege" or "establish" his or her reasons for doing business with the defendant. *Ante*, at 14. But the implicit assumption here—that the plaintiff bears the burden of proving personal jurisdiction—is often mistaken. Perhaps because a lack of personal jurisdiction is a waivable affirmative defense, some States place the burden of proving the defense on the defendant. Even in places where the plaintiff bears the burden, I fail to see why it would be so terrible (or burdensome) to require an individual to plead and prove his or her reasons for purchase. Frequently, doing so may be simple—far simpler than showing how the defendant's connections with the jurisdiction satisfy a new and amorphous "affiliation" test.

*County of Marin*, 495 U. S. 604, 610–611 (1990); J. Story, Commentaries on the Conflict of Laws 912–913 (3d ed. 1846); *Massie* v. *Watts*, 6 Cranch 148, 157, 161–162 (1810).[2]

*International Shoe*'s emergence may be attributable to many influences, but at least part of the story seems to involve the rise of corporations and interstate trade. See *Honda Motor Co.* v. *Oberg*, 512 U. S. 415, 431 (1994). A corporation doing business in its State of incorporation is one thing; the old physical presence rules for individuals seem easily adaptable to them. But what happens when a corporation, created and able to operate thanks to the laws of one State, seeks the privilege of sending agents or products into another State?

Early on, many state courts held conduct like that renders an out-of-state corporation present in the second jurisdiction. And a present company could be sued for any claim, so long as the plaintiff served an employee doing corporate business within the second State. *E.g.*, *Pennsylvania Lumbermen's Mut. Fire Ins. Co.* v. *Meyer*, 197 U. S. 407, 413–415 (1905). Other States sought to obviate any potential question about corporate jurisdiction by requiring an out-of-state corporation to incorporate under their laws too, or at least designate an agent for service of process. Either way, the idea was to secure the out-of-state company's presence or consent to suit. *E.g.*, *Pennsylvania Fire Ins. Co. of Philadelphia* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93,

————————

[2] Some disagree that due process requires even this much. Recent scholarship, for example, contends *Pennoyer*'s territorial account of sovereign power is mostly right, but the rules it embodies are not "fixed in constitutional amber"—that is, Congress might be able to change them. Sachs, *Pennoyer* Was Right, 95 Texas L. Rev. 1249, 1255 (2017). Others suggest that fights over personal jurisdiction would be more sensibly waged under the Full Faith and Credit Clause. Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Colum. L. Rev. 1, 3 (1945). Whether these theories are right or wrong, they at least seek to answer the right question—what the Constitution as originally understood requires, not what nine judges consider "fair" and "just."

95–96 (1917).

Unsurprisingly, corporations soon looked for ways around rules like these. No one, after all, has ever liked greeting the process server. For centuries, individuals facing imminent suit sought to avoid it by fleeing the court's territorial jurisdiction. But this tactic proved "too crude for the American business genius," and it held some obvious disadvantages. See Jackson, What Price "Due Process," 5 N. Y. L. Rev. 435, 436 (1927). Corporations wanted to retain the privilege of sending their personnel and products to other jurisdictions where they lacked a charter to do business. At the same time, when confronted with lawsuits in the second forum, they sought to hide behind their foreign charters and deny their presence. Really, their strategy was to do business without being seen to do business. *Id.*, at 438 ("No longer is the foreign corporation confronted with the problem 'to be or not to be'—it can both be and not be!").

Initially and routinely, state courts rejected ploys like these. See, *e.g., Pullman Palace Car Co.* v. *Lawrence*, 74 Miss. 782, 796–799, 22 So. 53, 55–56 (Miss. 1897). But, in a series of decisions at the turn of the last century, this Court eventually provided a more receptive audience. On the one hand, the Court held that an out-of-state corporation often has a right to do business in another State unencumbered by that State's registration rules, thanks to the so-called dormant Commerce Clause. *International Textbook Co.* v. *Pigg*, 217 U. S. 91, 107–112 (1910). On the other hand, the Court began invoking the Due Process Clause to restrict the circumstances in which an out-of-state corporation could be deemed present. So, for example, the Court ruled that even an Oklahoma corporation purchasing a large portion of its merchandise in New York was not "doing business" there. *Rosenberg Bros. & Co.* v. *Curtis Brown Co.*, 260 U. S. 516, 517–518 (1923). Perhaps advocates of this arrangement thought it promoted national economic growth. See Dodd, Jurisdiction in Personal Actions, 23 Ill.

L. Rev. 427, 444–445 (1929). But critics questioned its fidelity to the Constitution and traditional jurisdictional principles, noting that it often left injured parties with no practical forum for their claims too. Jackson, 5 N. Y. L. Rev., at 436–438.

In many ways, *International Shoe* sought to start over. The Court "cast . . . aside" the old concepts of territorial jurisdiction that its own earlier decisions had seemingly twisted in favor of out-of-state corporations. *Burnham*, 495 U. S., at 618. At the same time, the Court *also* cast doubt on the idea, once pursued by many state courts, that a company "consents" to suit when it is forced to incorporate or designate an agent for receipt of process in a jurisdiction other than its home State. *Ibid.*[3] In place of nearly everything that had come before, the Court sought to build a new test focused on "'traditional notions of fair play and substantial justice.'" *International Shoe*, 326 U. S., at 316 (quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940)).

It was a heady promise. But it is unclear how far it has really taken us. Even today, this Court usually considers corporations "at home" and thus subject to general jurisdiction in only one or two States. All in a world where global conglomerates boast of their many "headquarters." The Court has issued these restrictive rulings, too, even though *individual* defendants remain subject to the old "tag" rule, allowing them to be sued on any claim anywhere they can be found. *Burnham*, 495 U. S., at 610–611.[4] Nearly 80

---

[3] It is unclear what remains of the old "consent" theory after *International Shoe*'s criticism. Some courts read *International Shoe* and the cases that follow as effectively foreclosing it, while others insist it remains viable. Compare *Lanham* v. *BNSF R. Co.*, 305 Neb. 124, 130–136, 939 N. W. 2d 363, 368–371 (Neb. 2020), with *Rodriguez* v. *Ford Motor Co.*, 2019-NMCA-023, ¶12–¶14, 458 P. 3d 569, 575–576 (N. M. Ct. App. 2018).

[4] Since *Burnham*, some courts have sought to revive the tag rule for artificial entities while others argue that doing so would be inconsistent

years removed from *International Shoe*, it seems corporations continue to receive special jurisdictional protections in the name of the Constitution. Less clear is why.

Maybe, too, *International Shoe* just doesn't work quite as well as it once did. For a period, its specific jurisdiction test might have seemed a reasonable new substitute for assessing corporate "presence," a way to identify those out-of-state corporations that were simply pretending to be absent from jurisdictions where they were really transacting business. When a company "purposefully availed" itself of the benefits of another State's market in the 1940s, it often involved sending in agents, advertising in local media, or developing a network of on-the-ground dealers, much as Ford did in these cases. *E.g., International Shoe*, 326 U. S., at 313–314, 320. But, today, even an individual retiree carving wooden decoys in Maine can "purposefully avail" himself of the chance to do business across the continent after drawing online orders to his e-Bay "store" thanks to Internet advertising with global reach. *Ante*, at 12–13, n. 4. A test once aimed at keeping corporations honest about their out-of-state operations now seemingly risks hauling individuals to jurisdictions where they have never set foot.

Perhaps this is the real reason why the majority introduces us to the hypothetical decoy salesman. Yes, he arguably availed himself of a new market. Yes, the plaintiff's injuries arguably arose from (or were caused by) the product he sold there. Yes, *International Shoe*'s old causation test would seemingly allow for personal jurisdiction. But maybe the majority resists that conclusion because the old test no longer seems as reliable a proxy for determining corporate presence as it once did. Maybe *that's* the intuition

--------

with *International Shoe*. Compare *First Am. Corp.* v. *Price Waterhouse LLP*, 154 F. 3d 16, 20–21 (CA2 1998), with *Martinez* v. *Aero Caribbean*, 764 F. 3d 1062, 1067–1069 (CA9 2014).

lying behind the majority's introduction of its new "affilia-
tion" rule and its comparison of the Maine retiree's "spo-
radic" and "isolated" sales in the plaintiff's State and Ford's
deep "relationships" and "connections" with Montana and
Minnesota. *Ante,* at 13, n. 4.

If that is the logic at play here, I cannot help but wonder
if we are destined to return where we began. Perhaps all of
this Court's efforts since *International Shoe*, including
those of today's majority, might be understood as seeking to
recreate in new terms a jurisprudence about corporate ju-
risdiction that was developing before this Court's muscular
interventions in the early 20th century. Perhaps it was, is,
and in the end always will be about trying to assess fairly a
corporate defendant's presence or consent. *International
Shoe* may have sought to move past those questions. But
maybe all we have done since is struggle for new words to
express the old ideas. Perhaps, too, none of this should
come as a surprise. New technologies and new schemes to
evade the process server will always be with us. But if our
concern is with "'*traditional* notions of fair play and sub-
stantial justice,'" *International Shoe*, 326 U. S., at 316 (em-
phasis added), not just our personal and idiosyncratic im-
pressions of those things, perhaps we will always wind up
asking variations of the same questions.[5]

None of this is to cast doubt on the outcome of these cases.

_____

[5]The majority worries that the thoughts expressed here threaten to
"transfigure our specific jurisdiction standard as applied to corporations"
and "return [us] to the mid-19th century." *Ante*, at 7, n. 2; *ante*, at 9, n. 3.
But it has become a tired trope to criticize any reference to the Constitu-
tion's original meaning as (somehow) both radical and antiquated. Seek-
ing to understand the Constitution's original meaning is part of our
job. What's the majority's real worry anyway—that corporations might
lose special protections? The Constitution has always allowed suits
against *individuals* on any issue in any State where they set foot. *Supra,*
at 8–9. Yet the majority seems to recoil at even entertaining the possi-
bility the Constitution might tolerate similar results for "nationwide cor-
poration[s]," whose "business is everywhere." *Ante*, at 2; *ante*, at 9, n. 3.

The parties have not pointed to anything in the Constitution's original meaning or its history that might allow Ford to evade answering the plaintiffs' claims in Montana or Minnesota courts. No one seriously questions that the company, seeking to do business, entered those jurisdictions through the front door. And I cannot see why, when faced with the process server, it should be allowed to escape out the back. Jackson, 5 N. Y. L. Rev., at 439. The real struggle here isn't with settling on the right outcome in these cases, but with making sense of our personal jurisdiction jurisprudence and *International Shoe*'s increasingly doubtful dichotomy. On those scores, I readily admit that I finish these cases with even more questions than I had at the start. Hopefully, future litigants and lower courts will help us face these tangles and sort out a responsible way to address the challenges posed by our changing economy in light of the Constitution's text and the lessons of history.